AUSA John D. Mitchell (312) 353-5159
AUSA Esther Mignanelli (312) 353-5323

FILED
JAN 22 2020
MAGISTRATE JUDGE
GABRIEL A. FUENTES

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

NOEL JACQUEZ

CASE NUMBER:
UNDER SEAL

20CR 047

CRIMINAL COMPLAINT MAGISTRATE JUDGE FUENTES

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about August 8, 2019, at Aurora, Illinois, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | On or about August 8, 2019, at Aurora, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant did knowingly and intentionally distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1) |

This criminal complaint is based upon these facts:

__X__ Continued on the attached sheet.

JEFFREY A. HAHN
Task Force Officer, Federal Bureau of Investigation (FBI)

Sworn to before me and signed in my presence.

Date: January 22, 2020

Judge's signature

City and state: Chicago, Illinois

GABRIEL A. FUENTES, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

# AFFIDAVIT

I, JEFFREY A. HAHN, being duly sworn, state as follows:

1. I am a Task Force Officer with the Federal Bureau of Investigation (FBI), and have been so employed for 6 years. My current responsibilities include the investigation of narcotics trafficking offenses.

2. This affidavit is submitted in support of a criminal complaint alleging that Noel Jacquez has violated Title 21, United States Code, Section 841(a)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging JACQUEZ with knowingly and intentionally distributing a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, physical surveillance, court-authorized intercepted phone calls, as well as my training and experience and the training and experience of other law enforcement officers with whom I have consulted.

## FACTS ESTABLISHING PROBABLE CAUSE

4. In March 2018, a cooperating source ("CS-1")[1] provided information to the Aurora Police Department and the FBI (collectively "law enforcement officers" or "LEOs"). At LEOs' instruction, CS-1 introduced an undercover officer (a "UC") to INDIVIDUAL A for the purpose of having the UC make controlled purchases of cocaine from INDIVIDUAL A. Beginning on March 16, 2018, and most recently on August 16, 2019, the UC has participated in approximately 17 controlled purchases of cocaine from INDIVIDUAL A.

5. Based on the UC's controlled narcotics purchases, Court-authorized intercepted calls over phones used by, among others, INDIVIDUAL A, physical surveillance, and other evidence gathered during the investigation, LEOs have identified JACQUEZ as a suspected cocaine supplier to Individual A. In particular, as explained in more detail below, there is probable cause to believe that on or about August 8, 2019 and on or about August 16, 2019, JACQUEZ knowingly and intentionally distributed a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

---

[1] CS-1 has been working with FBI since December 2016. CS-1 is not being paid for his/her cooperation. CS-1 has asked for consideration on two active fraud cases in state courts. No promises have been made to CS-1. CS-1 has a criminal history that includes convictions for Fraudulent Activity, Assault, and Larceny. The information provided by CS-1 has been independently corroborated by, among other things, physical surveillance, consensual recordings, and controlled purchases of cocaine by undercover officers.

### A. On August 8, 2019, JACQUEZ Distributed Cocaine to Indivdual A

6. As explained below, on or about August 8, 2019, JACQUEZ Distributed Cocaine to Indivdual A, who distributed approximately 250.7 grams of the cocaine to an undercover law enforcement officer ("UC").

7. Specifically, on August 8, 2019, between approximately 2:45 p.m. and 3:02 p.m., the UC exchanged a series of consensually captured text messages with INDIVIDUAL A, who was using Target Phone 1.[2] During this exchange, the UC stated, "yooooo[.]"[3] INDIVIDUAL A responded, "WhaWhat up[?]" The UC stated,

---

[2] INDIVIDUAL A was identified as the user of Target Phone 1 based in part on the following. Between March 2018 and August 2019, on approximately 17 occasions, INDIVIDUAL A has sold cocaine to the UC. Based on law enforcement booking photos, the UC has positively identified the person she/he has met with for those controlled narcotics purchases as DANNY INDIVIDUAL A. Further, since March 2018, the UC has communicated with INDIVIDUAL A, using Target Phone 1, to coordinate the time and place for the controlled cocaine purchases. LEOs recorded the calls and meetings between the UC and INDIVIDUAL A. LEOs have compared the recordings of the calls and meetings between the UC and INDIVIDUAL A and the voice of the user of Target Phone 1 during the Court-authorized intercepted calls and positively identified INDIVIDUAL A as the user of Target Phone 1. Finally, during a Court-authorized intercepted call over Target Phone 1 on or about April 3, 2019, at approximately 3:24 p.m. (Session #321), an unidentified male caller asked if he was speaking with "[First and last name of Individual A]," and the user of Target Phone 1 confirmed that he was in fact [First and last name of INDIVIDUAL A].

[3] Some of the consensually-recorded conversations and meetings (the "recorded conversations") have been summarized in this affidavit. I based the language quoted from the recorded conversations throughout this affidavit on a preliminary review of the recorded conversations, and not on final transcripts of the recorded conversations. The times listed for the recorded conversations are approximate and in Central Time unless otherwise noted. The summaries of the recorded conversations do not include all statements or topics covered during the course of the recorded conversations and include my interpretation of words and phrases used in the recorded conversations. Unless otherwise noted, the quoted conversations in this affidavit are only portions, not full transcriptions, of the recorded conversations that occurred. At various points in the affidavit, I have included in brackets my interpretation of words and phrases used in the recorded conversations. I base my interpretations on information received from cooperating sources, the content and context of the recorded conversations, events occurring before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

"same as always bro..just tryn to keep it movin" and then, "cn u dona [what is the cost for nine ounces of cocaine?]" INDIVIDUAL A responded, "Okay I'll see what I can do when you looking[?]" The UC texted, "i was thnking frid or sat if its in but really an day othr thn Sunday[.]" INDIVIDUAL A responded, "He might drop it another $50 but that's about it [The price per ounce may have dropped $50 but INDIVIDUAL A could not give the UC a better price.]"

8. According to toll records, at approximately 7:02 p.m., Target Phone 1 placed an outgoing call to phone number 224-508-2096 ("JACQUEZ Phone 1").[4] The call lasted approximately 1 minute and 10 seconds in duration. Based on my training, experience, and familiarity with this case – including prior and subsequent communications between the UC and INDIVIDUAL A and INDIVIDUAL A's August 9, 2019 sale of over 250 grams of cocaine to the UC – I believe that, during this call, JACQUEZ and INDIVIDUAL A discussed the potential sale of a quantity of cocaine.

9. At approximately 7:13 p.m., LEOs observed INDIVIDUAL A leaving the Luxemberger Club located at 416 High Street, Aurora, Illinois. At approximately 7:14

---

[4] LEOs identified NOEL JACQUEZ as the user of JACQUEZ Phone 1 and (779) 777-0868 ("JACQUEZ Phone 1") based in part on several occasions on which INDIVIDUAL A and the user of JACQUEZ Phone 1 participated in court-authorized intercepted communications during which they agreed to meet at a certain time and a certain place, and LEOs conducting surveillance observed INDIVIDUAL A and JACQUEZ meet at the agreed upon time and place. For example, on or about April 22, 2019, at approximately 5:53 p.m. (Session 3511), LEOs intercepted a call between INDIVIDUAL A, using Target Phone 1, and JACQUEZ Phone 2. During the call, INDIVIDUAL A and the user of JACQUEZ Phone 1 agreed to meet at A-Town Pub in Aurora, Illinois. Three minutes later, at approximately 5:55 p.m., LEOs observed INDIVIDUAL A, meet in the parking lot of A-Town Pub with an individual who was identified, based on police booking photos, as NOEL JACQUEZ. Further, LEOs positively identified the user of JACQUEZ Phone 1 and JACQUEZ Phone 2 as the same person: NOEL JACQUEZ.

p.m., INDIVIDUAL A, using Target Phone 1, received a text message from JACQUEZ Phone 1.

10. At approximately 7:20 p.m., LEOs observed INDIVIDUAL A arrive at the Sav-A-Lot located at 210 North Lake Street, Aurora, Illinois. LEOs observed INDIVIDUAL A park her/his vehicle next to a blue 2002 Jeep, and further observed NOEL JACQUEZ exit the driver's door of the Jeep and enter INDIVIDUAL A's vehicle.

11. At approximately 7:21 p.m., while JACQUEZ was still inside INDIVIDUAL A's vehicle, the UC missed a phone call from INDIVIDUAL A. At approximately 7:24 p.m., while JACQUEZ was seated in the front passenger's seat of INDIVIDUAL A's vehicle, the UC and INDIVIDUAL A participated in a consensually recoreded phone call. During the call, INDIVIDUAL A stated, "I could do that [cocaine sale] tomorrow for you." The UC asked, "What kind of price are we talking?" INDIVIDUAL A responded, "He just dropped it [INDIVIDUAL A's supplier—JACQUEZ—dropped the per ounce price of the cocaine]. Exactly what I told you, but its that booyah [high quality cocaine]." The UC stated, "About fifty less so like, uh, 1150? [Nine ounce of cocaine would cost approximate $1150]." INDIVIDUAL A responded, "Yep." The call continued, and UC and INDIVIDUAL A agreed to meet around 4:30. INDIVIDUAL A stated, "Why don't we meet at my crib bro? Cuz man, something like that [large quantity of cocaine]. I don't want to really head out that way. It feels a lot safer."

5

12. At approximately 7:24 p.m., immediately after the call between the UC and INDIVIDUAL A ended, LEOs observed JACQUEZ exit INDIVIDUAL A's vehicle, re-enter the Jeep, and both INDIVIDUAL A and JACQUEZ departed the area.

13. Based on my training, experience, and familiarity with this case – including prior and subsequent communications between the UC and INDIVIDUAL A and INDIVIDUAL A's August 9, 2019 sale of over 250 grams of cocaine to the UC – I believe that, during this meeting at the Sav-A-Lot located at 210 North Lake Street, Aurora, JACQUEZ supplied INDIVIDUAL A with at least approximately nine ounces of cocaine.

14. At approximately 7:31 p.m., LEOs observed INDIVIDUAL A arrive at a residence on the 1000 block of Pleasure Court in Aurora, Illinois, which is a location that other LEOs and I believe is a suspected is used by INDIVIDUAL A to store her/his narcotics. At approximately 7:49 p.m., LEOs observed INDIVIDUAL A exit the residence and drive away from the area. Based on my training, experience, and familiarity with this case – including prior and subsequent communications between the UC and INDIVIDUAL A and INDIVIDUAL A's August 9, 2019 sale of over 250 grams of cocaine to the UC – I believe that, at this time, INDIVIDUAL A dropped off at this location at least nine ounces of cocaine that he had obtained earlier from JACQUEZ, to sell to the UC the following day.

15. According to toll records, at approximately 7:54 p.m., Target Phone 1, used by INDIVIDUAL A, placed an outgoing call to 224-508-2096 ("JACQUEZ Phone 1"). The call lasted approximately 27 seconds in duration. At approximately 8:13

6

p.m., Target Phone 1, used by INDIVIDUAL A, received a call from JACQUEZ Phone 1. The call lasted approximately 32 seconds in duration.

16. According to toll records, the following day, August 9, 2019, at approximately 8:22 a.m., Target Phone 1, used by INDIVIDUAL A, placed an outgoing call to JACQUEZ Phone 1. The call lasted approximately 32 seconds in duration.

17. Six minutes later, at approximately 8:28 a.m., the UC received a text message from INDIVIDUAL A that stated, "5 o'clock 9 piece nugget [meet at 5 p.m. for a 9-ounce cocaine transaction]." At approximately 9:08 a.m., INDIVIDUAL A sent the UC a text message that read, "[address for residence on the 500 block] South Gladstone," which LEOs have identified during the investigation as INDIVIDUAL A's residence.

18. According to toll records, at approximately 2:20 p.m., Target Phone 1, used by INDIVIDUAL A, placed an outgoing call to JACQUEZ Phone 1. The call lasted approximately 56 seconds in duration.

19. At approximately 3:14 p.m., INDIVIDUAL A sent the UC a text message that read, "I'll be at my house at 5:30[.] Everything's all good I'm just still working[.]"

20. According to toll records, at approximately 3:48 p.m., Target Phone 1, used by INDIVIDUAL A, sent a text message to JACQUEZ Phone 1. At approximately 3:50 p.m., Target Phone 1, used by INDIVIDUAL A, received a text message from JACQUEZ Phone 1. At approximately 4:23 p.m., Target Phone 1, used by INDIVIDUAL A, received a call from JACQUEZ Phone 1. Based on my training,

experience, and familiarity with this case – including prior and subsequent communications between the UC and INDIVIDUAL A and INDIVIDUAL A's August 9, 2019 sale of over 250 grams of cocaine to the UC – I believe that, during these calls, INDIVIDUAL A and Jacquez discussed the status of the cocaine sale to the UC.

21. On August 9, 2019, at approximately 4:44 p.m., LEOs observed INDIVIDUAL A arrive at INDIVIDUAL A's suspected stash house, located on the 1000 block of Pleasure Court in Aurora. At approximately 5:00 p.m., LEOs observed INDIVIDUAL A exit the residence and drive away from the area. Based on my training, experience, and familiarity with this case – including prior and subsequent communications between the UC and INDIVIDUAL A, prior and subsequent surveillance, toll records, and INDIVIDUAL A's August 9, 2019 sale of over 250 grams of cocaine to the UC – I believe that, at this time, INDIVIDUAL A retrieved at least nine ounces of cocaine that he had obtained the previous day from JACQUEZ, to sell to the UC later that day.

22. LEOs maintained surveillance, and at approximately 5:16 p.m. INDIVIDUAL A sent a text message to the UC which stated, "I'm ready when you are bro[.]" At approximately 5:17 p.m., the UC responded, "looks lke about 15 mns[.]"

23. At approximately 5:18 p.m., INDIVIDUAL A sent a text message to the UC that stated, "no problem. Let me know when you're 5 minutes away[.]"

24. At approximately 5:24 p.m., the UC sent a text to INDIVIDUAL A that read, "5[.]"

8

25. At approximately 5:29 p.m., INDIVIDUAL A arrived at her/his residence on the 500 block of South Gladstone, Aurora, Illinois.

26. On August 9, 2019, at approximately 5:31 p.m., the UC entered INDIVIDUAL A's residence on the 500 block of South Gladstone in Aurora. At that time, the UC, while outfitted with recording devices, met with INDIVIDUAL A in INDIVIDUAL A's residence and exchanged $10,350 in pre-registered government funds in exchange for approximately nine ounces of a substance that later tested positive for the presence of cocaine.

27. According to toll records, at approximately 5:33 p.m., INDIVIDUAL A received a call from JACQUEZ Phone 1. At approximately 5:45 p.m., INDIVIDUAL A made a call to JACQUEZ Phone 1. At approximately 10:48 p.m., INDIVIDUAL A received a text message from JACQUEZ Phone 1. Based on my training, experience, and familiarity with this case – including prior and subsequent communications between the UC and INDIVIDUAL A, prior and subsequent surveillance, toll records, and INDIVIDUAL A's August 9, 2019 sale of over 250 grams of cocaine to the UC – I believe that, during these contacts, INDIVIDUAL A advised JACQUEZ that the cocaine sale to the UC was successfully completed.

28. Based on training, experience, and knowledge of the investigation, other LEOs and I believe that on August 8, 2019, INDIVIDUAL A and JACQUEZ met at the Sav-A-Lot located at 210 North Lake Street, Aurora, Illinois, at which time JACQUEZ supplied INDIVIDUAL A with at least approximately nine ounces of

9

suspected cocaine. On August 9, 2019, INDIVIDUAL A supplied approximately 250.57 grams of that cocaine to a UC in exchange for $10,350.

**B. On August 16, 2019, INDIVIDUAL A Received Suspected Cocaine from NOEL JACQUEZ and Later Distributed Approximately 269.39 Grams of the Cocaine to a UC**

29. As explained below, on or about August 16, 2019, JACQUEZ Distributed cocaine to INDIVIDUAL A, who distributed approximately 269.39 grams of the cocaine to the UC.

30. Specifically, on August 15, 2019, beginning at approximately 12:16 p.m., the UC exchanged a series of text messages with INDIVIDUAL A, using Target Phone 1. The UC wrote, "yooooo...can we do a repeat tomorrow [the UC asked if she/he could buy more cocaine from INDIVIDUAL A the following day]?" At approximately 12:16 p.m., INDIVIDUAL A, using Target Phone 1, responded, "Absolutely...5:30 my house."

31. According to toll records, a minute later, at approximately 12:17 p.m., Target Phone 1, used by INDIVIDUAL A, placed an outgoing call to JACQUEZ Phone 1, used by NOEL JACQUEZ. The call lasted approximately 40 seconds in duration. At 12:18 p.m. INDIVIDUAL A, using Target Phone 1, received an incoming call from JACQUEZ Phone 1. That call lasted 16 seconds in duration. Based on my training, experience, and familiarity with this case – including prior and subsequent communications between the UC and INDIVIDUAL A and INDIVIDUAL A's August 16, 2019 sale of cocaine to the UC – I believe that, during these calls, JACQUEZ and INDIVIDUAL A discussed the potential sale of a quantity of cocaine.

32. On August 16, 2019, at approximately 8:18 a.m., the UC received a text message from INDIVIDUAL A, using Target Phone 1, which stated, "We're all good bro same flavor." At approximately 8:23 a.m., the UC responded "that's whatsup...see u ltr thn."

33. At approximately 4:03 p.m., the UC sent INDIVIDUAL A a text message stating, "stll 530[?]."

34. At approximately 4:19 p.m., Target Phone 1, used by INDIVIDUAL A, received an incoming call from JACQUEZ Phone 1. That call lasted 1 minute and 16 seconds in duration.

35. Two minutes later, at approximately 4:21 p.m., INDIVIDUAL A, using Target Phone 1, texted the UC. In the text message, the UC wrote, "Yes sir I', ready [INDIVIDUAL A was ready to meet the UC and sell the UC narcotics]."

36. At approximately 4:36 p.m., INDIVIDUAL A received an incoming call from JACQUEZ Phone 1. That call lasted 13 seconds in duration.

37. At approximately 4:38 p.m., INDIVIDUAL A arrived at his residence, on the 500 block of South Gladstone, Aurora. LEOs observed a black SUV in the driveway of INDIVIDUAL A's residence. This vehicle, which according to Illinois Secretary of State records is registered to a relative of JACQUEZ, is a vehicle LEOs have observed NOEL JACQUEZ driving on several occasions during the investigation.

38. Based on my training, experience, and familiarity with this case – including prior and subsequent communications between the UC and INDIVIDUAL

A, INDIVIDUAL A's August 16, 2019 sale of cocaine to the UC, toll records, and prior and subsequent surveillance – I believe that, at that time, JACQUEZ met with INDIVIDUAL A at INDIVIDUAL A's residence on the 500 block of South Gladstone in Aurora and supplied INDIVIDUAL A with a quantity of cocaine.

39. At approximately 4:41 p.m., INDIVIDUAL A's vehicle and the black SUV departed separately from INDIVIDUAL A's residence.

40. Four minutes later, at approximately 4:45 p.m., LEOs observed INDIVIDUAL A arrive at the suspected stash house located on the 1000 block of Pleasure Court in Aurora.

41. At approximately 5:04 p.m., LEOs observed INDIVIDUAL A exit the suspected stash house on Pleasure Court carrying a paper bag with the Popeye's Chicken restaurant log on the outside. At approximately 5:06 p.m., LEOs observed INDIVIDUAL A enter his vehicle and drive away from the area.

42. At approximately 5:22 p.m., LEOs observed INDIVIDUAL A arrive at his residence and exit his vehicle carrying the same Popeye's Chicken restaurant bag LEOs had observed him carry out of the suspected stash house on Pleasure Court a short time earlier.

43. At approximately 5:42 p.m., the UC arrived at INDIVIDUAL A's residence on the 500 block of South Gladstone in Aurora. LEOs observed INDIVIDUAL A exit the residence and enter the UC's vehicle while holding the Popeye's Chicken restaurant bag. At that time, the UC, while outfitted with recording devices, met with INDIVIDUAL A in the UC's vehicle and exchanged $10,350 in pre-

registered government funds in exchange for approximately 269.39 grams of a substance that later tested positive for the presence of cocaine. The substance was contained in packaging and stored in a paper Popeye's Chicken restaurant bag.

44. After the controlled cocaine transaction between INDIVIDUAL A and the UC, INDIVIDUAL A and JACQUEZ participated in phone calls. For example, pen data from Target Phone 1 confirmed that on August 16, 2019, at approximately 6:13 p.m. INDIVIDUAL A, using Target Phone 1, placed a call to JACQUEZ Phone 1. This call was approximately 39 seconds in duration. Further, at approximately 6:14 p.m., JACQUEZ Phone 1 placed an incoming call to Target Phone 1, used by INDIVIDUAL A, and the call lasted approximately 21 seconds in duration.

45. Based on my training, experience, and familiarity with this case — including prior and subsequent communications between the UC and INDIVIDUAL A, INDIVIDUAL A's August 16, 2019 sale of cocaine to the UC, toll records, and prior and subsequent surveillance — I believe that, during these communications, INDIVIDUAL A made arrangements to deliver a portion of the proceeds of his cocaine sale to the UC to JACQUEZ.

46. At approximately 6:15 p.m., LEOs observed INDIVIDUAL A exit his residence at 509 S. Gladstone Avenue, Aurora, Illinois, and depart the area.

47. At approximately 6:21 p.m., INDIVIDUAL A was observed arriving at Walgreens, located at 1207 North Randall Road, Aurora, Illinois. LEOs also observed JACQUEZ, who arrived at the location driving a GMC Yukon. LEOs observed

INDIVIDUAL A park next to the GMC and enter the front passenger seat of JACQUEZ's GMC.

48. At approximately 6:22 p.m., INDIVIDUAL A exited JACQUEZ's GMC, entered his own vehicle, and both vehicle departed the area.

49. Based on training, experience, and knowledge of the investigation, other LEOs and I believe that (a) on August 16, 2019, INDIVIDUAL A and JACQUEZ met at INDIVIDUAL A's residence on the 500 block of South Gladstone in Aurora, at which time JACQUEZ supplied INDIVIDUAL A with a quantity of cocaine; (b) INDIVIDUAL A then traveled to his suspected stash house located on the 1000 block of Pleasure Court, Aurora, Illinois, where INDIVIDUAL A likely stored some of the suspected narcotics he received from JACQUEZ; (c) later that day, INDIVIDUAL A supplied approximately 269.39 grams of that cocaine to a UC in exchange for $10,350; and (d) on the evening of August 16, 2019, INDIVIDUAL A traveled to Walgreens, located at 1207 North Randall Road, Aurora, Illinois to meet JACQUEZ and deliver the proceeds of the sale of the cocaine previously supplied to the UC.

## CONCLUSION

50. Based on the foregoing, I submit that there is probable cause to believe that on or about August 8, 2019, at Aurora, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant NOEL JACQUEZ did knowingly and intentionally distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1)

FURTHER AFFIANT SAYETH NOT.

_____
JEFFREY A. HAHN
Task Force Officer, Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me on January 22, 2020.

_____
GABRIEL A. FUENTES
United States Magistrate Judge